PHOENIX LIMITED PARTNERSHIP OF RALEIGH, PLAINTIFF v. SARAH W. SIMPSON, ROBERT T. SIMPSON, EDNA JACQUELYN STEED WRAY, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF CHARLES W. WRAY, AND SHW, LLC, DEFENDANTS

No. COA07-1333-2

(Filed 22 December 2009)

**1. Appeal and Error— interlocutory order—partial summary judgment—substantial right—specific performance**

Although defendants' appeal from the grant of partial summary judgment was from an interlocutory order in a case arising out of defendants' exercise of an option to sell certain property, the order granting specific performance to plaintiff and requiring

defendants to convey the property to plaintiff affected a substantial right and was thus subject to immediate review.

## 2. Contracts— breach—waiver of time is of the essence clause

The trial court did not err by granting summary judgment in favor of plaintiff based on its conclusion that defendants had, as a matter of law, waived the time is of the essence clause in a case arising out of defendants' exercise of an option to sell certain property.

## 3. Laches— failure to show change in condition or relations—failure to show prejudice

The trial court did not err by dismissing defendants' affirmative defense of laches in a case arising out of defendants' exercise of an option to sell certain property.

Appeal by defendants from order entered 6 June 2007 by Judge Howard E. Manning, Jr. in Wake County Superior Court. Heard in the Court of Appeals 29 April 2008. Petition for rehearing allowed 1 May 2009. The following opinion supersedes and replaces the opinion filed 3 March 2009.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Peter J. Marino and Scott A. Miskimon, for plaintiff-appellee.*

*Thomas W. Steed, Jr. for defendants-appellants.*

GEER, Judge.

This litigation arises out of defendants' exercise of an option to sell certain property to plaintiff. The parties did not close on the property by 13 March 2001, the date specified in the contract for closing. Plaintiff subsequently brought suit when defendants declined to close in the fall of 2004. Defendants have appealed from the trial court's order granting partial summary judgment to plaintiff on plaintiff's breach of contract claim and ordering that defendants specifically perform the contract by executing and delivering a general warranty deed transferring the property at issue to plaintiff.

While defendants correctly point out that the contract containing the option included a "time is of the essence" provision applicable to the contract's specified closing date of 13 March 2001, we agree with

plaintiff that the undisputed facts establish that defendants waived that provision, and, therefore, plaintiff was not required to close on the property by the date specified in the contract. Generally, in the absence of a "time is of the essence" provision, the parties must perform within a reasonable amount of time of the date set for closing. In *Fletcher v. Jones*, 314 N.C. 389, 333 S.E.2d 731 (1985), however, our Supreme Court held that when the seller waived the original closing date, but indicated he still intended to perform once the condition to his performance was satisfied, the buyer's reasonable time for performance ran from the date the seller notified the buyer he was ready and able to close.

Here, the evidence is undisputed that defendants indicated to plaintiff they still intended to perform after waiving the original closing date, but that they never notified plaintiff they were ready and able to close. Therefore, under *Fletcher*, plaintiff was justified in waiting to tender its performance until it received such notice. Because defendants instead repudiated the contract, we affirm the trial court's grant of partial summary judgment on plaintiff's breach of contract claim and its order of specific performance.

## Facts

The undisputed facts are as follows. On 1 October 1995, plaintiff and defendants entered into a five-year lease agreement ("the contract"), pursuant to which defendants leased to plaintiff property located at 417 and 419 South McDowell Street in Raleigh ("the McDowell Street property"). Plaintiff owned an office building nearby and used the McDowell Street property as a surface parking lot for its tenants.

The contract contained a call option that granted plaintiff an option to purchase the McDowell Street property and a put option that granted defendants an option to require plaintiff to purchase the McDowell Street property. The contract also stated that upon exercise of either option, the purchase price would be the greater of $853,781.60 or the fair market value of the McDowell Street property as of the date the option was exercised. Absent an agreement by the parties, the fair market value was to be determined based on the opinions of three appraisers. Plaintiff and defendants would each select one appraiser and those two appraisers would then select the third appraiser. The fair market value would be the average of the two closest appraisals from the three appraisers.

PHOENIX LTD. P'SHIP OF RALEIGH v. SIMPSON

[201 N.C. App. 493 (2009)]

The contract required that the closing take place on the date 180 days following the date the option was exercised. The contract contained a "time is of the essence" provision that stated: "With respect to the performance of the obligations and duties in this Section [relating to the options], time is of the essence." At closing, defendants were required to deliver a general warranty deed conveying the McDowell Street property to plaintiff, an affidavit stating that defendants were not foreign persons within the meaning of the Internal Revenue Code, a title insurance policy, a closing statement, and possession of the McDowell Street property.

On 13 September 2000, defendants provided plaintiff with written notice that they were exercising the put option. Pursuant to the terms of the contract, the deadline for the closing was 13 March 2001. The parties followed the appraisal process for selection of the appraisers. On 6 December 2000, at the request of two of the appraisers, the parties agreed to allow an additional 30 days for completion of the appraisals. On 8 December 2000, a Phase I Environmental Site Assessment reported the existence of multiple environmental problems, and, as a result, plaintiff requested a Limited Phase II Environmental Site Assessment.

In the meantime, the appraisers issued a report estimating the fair market value of the McDowell Street property at $947,500.00. The report also stated, "We are aware that a Phase II environmental analysis is being conducted. As such, the foregoing value may require a downward adjustment in the event contaminants are found in, on, or near the subject site."

No closing occurred on or before 13 March 2001. On 26 March 2001, however, defendants executed a general warranty deed. That deed was delivered to Stephen D. Lowry, plaintiff's attorney. The deed was stamped "copy" and did not contain a notary seal or stamp.

The Limited Phase II Environmental Site Assessment dated 17 April 2001 reported that the groundwater contained traces of "VOCs exceeding the laboratory quantitation limits." Soil gas samples were also submitted for testing, and the laboratory analysis indicated "the presence of chlorinated VOCs and BTEX compounds." The environmental company, which conducted the tests, recommended that defendants, as the McDowell Street property owners, contact the North Carolina Department of Environment and Natural Resources ("NCDENR") to inform them of the site conditions. The company also stated that remedial measures might be necessary in order to be able

PHOENIX LTD. P'SHIP OF RALEIGH v. SIMPSON

[201 N.C. App. 493 (2009)]

to use the McDowell Street property depending on "the specific regu-latory requirements applied."

On 26 April 2001, plaintiff and defendants met to discuss the sta-tus of the transaction. The parties talked about the purchase price, the effect of the environmental problems on the McDowell Street property's value, the ability to develop the McDowell Street property and obtain financing, and the need to clean up the McDowell Street property. The parties disagree regarding what precisely was said dur-ing the meeting and what the outcome of the meeting was.

On 12 July 2001, defendants' realtor notified plaintiff that de-fendants had retained their own company to conduct further envi-ronmental tests to determine the source of the contamination. The letter specified that the company was in the process of gathering information and would prepare a reply to the environmental report obtained by plaintiff. In his letter, the realtor stated, "We will com-municate with you as time goes by."

In a letter dated 21 December 2001, defendants' realtor informed plaintiff that the investigation conducted by their environmental com-pany indicated that "former dry cleaning activities conducted at the property are in part a likely source of the detected ground water con-tamination." The letter also notified plaintiff that "there is sufficient information to enter the property into the North Carolina Dry-Cleaning Solvent Act [] program to provide financial assistance and limited third party liability protection." The realtor stated that defendants intended to enter the McDowell Street property into the North Carolina Dry-Cleaning Solvent Act program ("the dry clean-ing program").

There was no further communication between the parties until 18 August 2004 when plaintiff's attorney sent a letter to defendants inquiring about the status of the McDowell Street property. In de-fendants' response on 23 September 2004, they informed plaintiff that the McDowell Street property had been listed for sale at a price of $40.00 per square foot and advised plaintiff to contact them if plain-tiff was interested in learning more about the McDowell Street prop-erty. On 21 January 2005, defendants entered into an agreement to sell the McDowell Street property to the Persimmon Group, LLC for $1,352,560.00.

Plaintiff filed this action on 3 February 2005 seeking specific per-formance of the contract. Defendants filed their answer along with motions to dismiss. In their answer, defendants asserted the affirma-

tive defenses of repudiation, nonperformance, waiver, abandonment/rescission, unclean hands/estoppel, and laches. Defendants also included counterclaims for intentional interference with contract and breach of contract.

On 23 September 2005, plaintiff filed a motion for partial summary judgment with respect to defendants' affirmative defenses and their counterclaim for breach of contract. On 19 December 2005, the trial court entered an order ruling that plaintiff was entitled to partial summary judgment on the affirmative defenses of abandonment, waiver, rescission, and anticipatory repudiation. The court further ruled:

> Because there has been no "closing" and no final adjustment of the contract purchase price according to the terms of the contract, summary judgment on Phoenix's claim for specific performance and the Defendants' claim for breach of contract and issues related to the performance of both parties under the contract is not ripe for disposition at this point in the case.

The trial court ordered that those issues would "remain to be determined at a later time in the event this matter is not closed according to the terms of the contract."

At the request of all parties, the court conducted a hearing on 13 September 2006 to clarify its order. The court ultimately filed an amended order on 21 September 2006, explaining that it had viewed the defense of laches as subsumed under the dismissal of the abandonment affirmative defense, and, therefore, defendants' affirmative defense of laches should also be dismissed.

On 29 March 2007, plaintiff moved for partial summary judgment on defendant's liability for breach of contract, defendants' defense of unclean hands/estoppel, and plaintiff's entitlement to specific performance. On 6 June 2007, the trial court entered an order concluding that there were no genuine issues of material fact and that plaintiff was entitled to judgment as a matter of law on each issue. The court also incorporated by reference its prior rulings into the order. It then concluded that defendants were jointly and severally liable for breach of the contract to convey the McDowell Street property to plaintiff. The trial court "in its discretion" also determined that plaintiff was "entitled to specific performance of the contract to convey the Property" and ordered defendants to execute and deliver to plaintiff a general warranty deed conveying the McDowell Street property to

plaintiff within 30 days of the date of the filing of the order. The order specified that the purchase price was $947,500.00 with that amount "not subject to any claimed offset for the Property's diminished value due to the Property's environmental condition or the cost to clean up or remediate the Property." Defendants timely appealed to this Court from the trial court's grant of partial summary judgment.

## Discussion

[1] As a preliminary matter, we note that defendants' appeal is from an interlocutory order. Nevertheless, we agree with defendants that the order of the trial court granting specific performance to plaintiff and requiring defendants to convey the McDowell Street property to plaintiff affects a substantial right. *See Watson v. Millers Creek Lumber Co.*, 178 N.C. App. 552, 554, 631 S.E.2d 839, 840-41 (2006) (acknowledging that appeal from order granting partial summary judgment in case involving land purchase installment contract was interlocutory, but holding that order affected substantial right as it implicated title rights to disputed property). We, therefore, turn to the merits of defendants' appeal.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.R. Civ. P. 56(c). The party moving for summary judgment has the burden of establishing the lack of any triable issues. *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). Once the moving party meets its burden, then the non-moving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Id.* In opposing a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." N.C.R. Civ. P. 56(e). This Court reviews de novo a trial court's decision to grant summary judgment. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004).

I

[2] Defendants first point to the "time is of the essence" provision contained in the contract as supporting their claim that they were not required to convey the McDowell Street property to plaintiff in the fall of 2004. Defendants acknowledge that plaintiff con-

tends that this provision was waived, but argue that issues of fact exist regarding waiver.

As this Court has explained: " 'Waiver is always based upon an express or implied agreement. There must always be an intention to relinquish a right, advantage or benefit. The intention to waive may be expressed or implied from acts or conduct that naturally leads the other party to believe that the right has been intentionally given up.' " *Fairview Developers, Inc. v. Miller*, 187 N.C. App. 168, 172, 652 S.E.2d 365, 368 (2007) (quoting *Patterson v. Patterson*, 137 N.C. App. 653, 667, 529 S.E.2d 484, 492, *disc. review denied*, 352 N.C. 591, 544 S.E.2d 783 (2000)), *disc. review denied*, 362 N.C. 176, 658 S.E.2d 484 (2008).

While, as *Fairview Developers* acknowledges, a waiver may be express or implied, there is no contention in this case that there was an express waiver of the "time is of the essence" clause. The issue before this Court is, therefore, whether the undisputed facts establish an implied waiver. "Although '[w]aiver is a mixed question of law and fact[, w]hen the facts are determined, it becomes a question of law.'" *Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 575, 589 S.E.2d 423, 428 (2003) (quoting *Hicks v. Home Sec. Life Ins. Co.*, 226 N.C. 614, 619, 39 S.E.2d 914, 918 (1946)), *disc. review denied sub nom. Santomassimo v. Valley Forge Life Ins. Co.*, 358 N.C. 377, 598 S.E.2d 138 (2004).

It is undisputed that defendants did not insist on closing on the date specified in the contract notwithstanding the contract's "time is of the essence" clause. Defendants, however, point to the fact that they tendered a signed warranty deed within a short period of time after the closing date. They note that in *Fairview Developers*, 187 N.C. App. at 173, 652 S.E.2d at 368, this Court held that a defendant did not waive a "time is of the essence" clause when the defendant expressed it was ready, willing, and able to close two days after the original closing date. The defendant in *Fairview Developers*, however, expressly "agreed to close" two days after the original closing date, *id.*, while, in this case, defendants only delivered a non-recordable "copy" of a deed and did not tender the remaining documents required under the contract for the closing.

Defendants also point to their evidence of what occurred at the April meeting—more than a month after the closing date—and defendants' and their attorney's belief, based on that meeting, that plaintiff had no intention of purchasing the property and that the deal was

dead. Defendants, however, cite to no evidence that they ever told plaintiff that they were insisting on the closing date specified in the contract or that, prior to the fall of 2004, they advised plaintiff that they deemed the contract terminated for failure to close. *See Danville Lumber & Mfg. Co. v. Gallivan Bldg. Co.*, 177 N.C. 104, 107, 97 S.E. 718, 720 (1919) ("The secret understanding or intent of the parties is immaterial on the question of waiver."). To the contrary, defendant Sarah Simpson testified that, prior to the April meeting, she expected the closing to occur a month or two later—long after the contract's specified closing date.

Moreover, following that meeting, defendants sought permission for their environmental consultant to contact plaintiff's consultant to discuss the condition of the McDowell Street property, and defendants' consultant performed its own tests on the property. On 12 July 2001, defendants' realtor wrote plaintiff "[w]ith regards to the sale and purchase of the [McDowell Street] property" in order to provide plaintiff with information about defendants' environmental consultant. After indicating that the consultant "has started the process of gathering information," he promised that "[w]e will communicate with you as time goes by." On 21 December 2001, the realtor forwarded another letter to plaintiff "[w]ith regards to the sale and purchase of the [McDowell Street] property" that described the results of defendants' environmental consultant's investigation, promised a copy of the report "shortly after the holidays," and expressed defendants' intention to enter the property into the State's dry cleaning program.

These undisputed facts demonstrating that defendants not only never insisted on closing on the specified closing date, but made statements and took actions manifesting an intent that closing should occur at some unspecified later date establish that defendants waived the "time is of the essence" clause. *See Harris & Harris Const. Co. v. Crain & Denbo, Inc.*, 256 N.C. 110, 119, 123 S.E.2d 590, 596 (1962) (holding that waiver "is a question of intent, which may be inferred from a party's conduct"). The undisputed facts establish conduct that naturally would lead plaintiff to believe that defendants had dispensed with their right to insist that time was of the essence with respect to closing on the property. *See Medearis v. Trustees of Myers Park Baptist Church*, 148 N.C. App. 1, 12, 558 S.E.2d 199, 206-07 (2001) ("A waiver is implied when a person dispenses with a right by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right." (internal quotation marks

omitted)), *disc. review denied*, 355 N.C. 493, 563 S.E.2d 190 (2002). Accordingly, the trial court did not err in concluding that defendants had, as a matter of law, waived the "time is of the essence" clause. *Id.* at 14, 558 S.E.2d at 208 (affirming grant of summary judgment on issue of waiver when "Petitioners, by their conduct and statements, impliedly led respondents to believe that petitioners dispensed with their right" to enforce restrictive covenants).

Defendants argue, however, that even if waiver of the "time is of the essence" clause is established, that waiver does not mandate judgment in plaintiff's favor. Defendants point out that in North Carolina, absent a "time is of the essence" clause, the parties to a real property purchase agreement are allowed a " 'reasonable time after the date set for closing to complete performance.' " *Ball v. Maynard*, 184 N.C. App. 99, 102, 645 S.E.2d 890, 893 (quoting *Dishner Developers, Inc. v. Brown*, 145 N.C. App. 375, 378, 549 S.E.2d 904, 906, *aff'd per curiam*, 354 N.C. 569, 557 S.E.2d 528 (2001)), *disc. review denied*, 362 N.C. 86, 656 S.E.2d 591 (2007). Defendants contend there are issues of fact regarding whether the time that elapsed between the original closing date and the date plaintiff sought to close was a reasonable period of time in which to complete performance.

This argument, however, presumes that the reasonable time for performance in this case should be calculated from the original date set for closing. Our Supreme Court's decision in *Fletcher*, requires, however, that we hold otherwise.

In *Fletcher*, 314 N.C. at 390, 333 S.E.2d at 733, the plaintiff and the defendant entered into a contract providing that the plaintiff would purchase certain property from the defendant for $45,000.00. The closing date set out in the contract was 9 January 1981. The contract provided, however, that the sale was subject to the defendant's obtaining a divorce from his spouse or the spouse's agreeing to execute a deed to the property. When the condition was not satisfied on 9 January 1981, the parties entered into an addendum to the contract that extended the closing date to 10 March 1981. *Id.*

Despite the fact that 10 March 1981 came and went without the parties closing on the contract, the defendant and his attorney repeatedly assured the plaintiff and her attorney that although the defendant was not ready to close on the contract yet because his divorce was not finalized, the defendant intended to close on the contract soon. *Id.* at 391, 33 S.E.2d at 733. On 4 August 1981, the de-

fendant notified the plaintiff that his divorce was finalized and he was ready to close on the sale, but neither party took any action after that notice to arrange a closing on the property. *Id.* During the third week of September 1981, the defendant accepted another offer to purchase the property and subsequently notified the plaintiff that the contract between the defendant and the plaintiff was void. *Id.* at 391-92, 33 S.E.2d at 733. On 26 September 1981, the plaintiff's attorney advised the defendant's attorney that the plaintiff intended to enforce the contract and also tendered the entire amount of cash due at closing, along with a properly executed promissory note for the balance of the purchase price as required by the contract. *Id.* at 395-96, 33 S.E.2d at 736. When the plaintiff subsequently sued for specific performance, the defendant contended the plaintiff had failed to tender performance within a reasonable time. The trial court ordered the defendant to perform the contract, and the defendant appealed. *Id.* at 392, 33 S.E.2d at 734.

The Supreme Court held that the defendant had waived the 10 March 1981 closing date through oral representations and assurances of the defendant's willingness to close on the contract. The Court agreed with the Court of Appeals that as a result of this waiver, the reasonable time doctrine applied, but disagreed with the Court of Appeals' conclusion "that the reasonable time for performance was to be computed from [the 10 March 1981 closing date]." *Id.* at 394, 333 S.E.2d at 735. Instead, the Court held that once the 10 March 1981 closing date had been waived, then the parties were "required to tender performance concurrently"—and thus the reasonable time period began running—when the defendant notified the plaintiff on 4 August 1981 that he was ready and able to move forward with the closing. *Id.* at 395, 333 S.E.2d at 735. The Court then held that the trial court's findings supported its conclusion of law that plaintiff " 'made full and sufficient tender' within a reasonable time after being notified that defendant was ready to close." *Id.* at 399, 333 S.E.2d at 738. We find *Fletcher's* analysis controlling in this case.

Plaintiff argues that defendants' conduct in proceeding with the environmental cleanup of the McDowell Street property indicated to plaintiff that defendants still intended to perform under the contract once the cleanup was completed. The contract between the parties contained the following provision:

> Indemnifications. Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all claims, judg-

ments, suits, causes of action, damages, penalties, fines, liabilities, losses, and expenses that arise during or after the term of this Lease as a result of the breach by Tenant of any of Tenant's obligations and covenants set forth in this Section 39; provided, however, *Tenant shall not be responsible for any costs or expenses relating to the remediation or cleanup of Hazardous Materials which were located on, under, or about the Property prior to the date of this Lease* or which are placed or discharged on or about the Property unless caused by Tenant or Tenant's employees, contractors, or agents (collectively, the "Non-Tenant Conditions"). *Landlord agrees to indemnify, defend, and hold Tenant harmless from any and all claims, damages, fines, judgments, penalties, costs, liabilities, or losses arising during or after the term of this Lease from or in connection with any Non-Tenant Conditions* or the breach by Landlord of any of Landlord's obligations, duties, covenants, and representations in this Section 39.

(Emphasis added.)

Under that provision, plaintiff could recover from defendants for losses or damages incurred by plaintiff as a result of environmental contamination on the McDowell Street property. While defendants might be able to mitigate their potential liability by undertaking remediation, this indemnification provision did not require that defendants do so. Defendants could, under this provision, choose simply to reimburse plaintiff for the costs or expenses incurred for any cleanup.

Plaintiff argues that although defendants may not have been contractually obligated under the lease agreement to remediate any environmental problems on the property, defendants by their conduct indicated to plaintiff that they had elected to do so rather than reduce the purchase price to reflect their liability for any contamination found on the McDowell Street property. Therefore, plaintiff contends, defendants needed to notify it that they had completed the cleanup and were ready and able to perform under the contract before the reasonable time period for plaintiff's performance would begin running.

We find plaintiff's reasoning persuasive. As in *Fletcher*, where the defendant continually reassured the plaintiff that he was waiting for his divorce to be finalized and that he was planning to close on the contract as soon as that condition happened, here, defendants' con-

duct in pursuing an environmental cleanup—including hiring their own environmental consultant, telling plaintiff that they were conducting an environmental investigation, notifying plaintiff of the results of that investigation, and stating that they wanted to enroll the McDowell Street property in the State's dry cleaning program—coupled with the fact that an environmental cleanup could take years to complete, indicated to plaintiff that defendants still intended to perform under the contract despite the passing of the original closing date.

Under *Fletcher*, in order for the clock to start ticking on the reasonable time frame, defendants were required to notify plaintiff that they had completed their cleanup and were ready and able to perform. The Supreme Court in *Fletcher* assessed the reasonableness of the time frame between the date that the defendant notified the plaintiff that his divorce had been finalized and he was ready and able to perform and the date on which the plaintiff tendered his performance. Here, however, the evidence is undisputed that defendants never notified plaintiff that they were ready and able to perform and, therefore, the reasonable time for plaintiff's performance had not yet begun.

When plaintiff inquired about the status of the cleanup and defendants' ability to perform, rather than notifying plaintiff that they were ready to close on the contract, defendants instead told plaintiff that they had placed the property back on the market at a higher price than the contract price, and they subsequently entered into an agreement to sell the property to another buyer. Plaintiff contends that this action constituted an anticipatory breach. " 'The doctrine of anticipatory breach is well known: when a party to a contract gives notice that he will not honor the contract, the other party to the contract is no longer required to make a tender or otherwise perform under the contract because of the anticipatory breach of the first party.' " *First Union Nat. Bank of N.C. v. Naylor*, 102 N.C. App. 719, 724, 404 S.E.2d 161, 163 (1991) (quoting *Dixon v. Kinser*, 54 N.C. App. 94, 101, 282 S.E.2d 529, 534 (1981), *disc. review denied*, 304 N.C. 725, 288 S.E.2d 805 (1982)).

Because by their words and conduct, defendants indicated that they would no longer honor the contract, plaintiff was excused from its obligation to tender the purchase price and had an action for breach of contract. *See id.* at 724-25, 404 S.E.2d at 164 (affirming grant of summary judgment to plaintiff where defendant anticipato-

rily breached their contract). We, therefore, affirm the trial court's grant of partial summary judgment to plaintiff.

II

[3] Defendants also contend the trial court erred in dismissing their affirmative defense of laches. Defendants argue that plaintiff's claim is barred by laches because of plaintiff's three-year delay in asserting its claim. "Laches is an affirmative defense that requires proof of three elements: (1) the delay must result in some change in the property condition or relations of the parties, (2) the delay must be unreasonable and harmful, and (3) the claimant must not know of the existence of the grounds for the claim." *N.C. State Bar v. Gilbert*, 189 N.C. App. 320, 329, 663 S.E.2d 1, 7, *disc. review denied*, 362 N.C. 682, 670 S.E.2d 234 (2008). It is well established that "the mere passage of time is insufficient to support a finding of laches . . . ." *MMR Holdings, LLC v. City of Charlotte*, 148 N.C. App. 208, 209, 558 S.E.2d 197, 198 (2001).

Here, we need not address the second two elements of laches because defendants failed to show that the delay resulted in a change in the McDowell Street property's condition or the relations of the parties. *See Teachey v. Gurley*, 214 N.C. 288, 294, 199 S.E. 83, 88 (1938) ("In equity, where lapse of time has resulted in some change in the condition of the property or in the relations of the parties which would make it unjust to permit the prosecution of the claim, the doctrine of laches will be applied."). The sole prejudice from the delay identified by defendants is (1) the increase in value of the McDowell Street property as a result of the siting of the Raleigh Civic Center and (2) the loss of a significant witness due to illness.

With respect to the increase in value, that increase was fortuitous and not due to any action taken by defendants during the delay that increased the value of the property. *Compare Farley v. Holler*, 185 N.C. App. 130, 133, 647 S.E.2d 675, 678 (2007) (concluding that plaintiff's claims were barred by laches when "the delay of time has resulted in both a change in the condition of the property through the $100,000 in repairs to the street and a change in the relations of the parties through the changing of the owners of the lots in the subdivision"). Any prejudice suffered by defendants did not arise out of the delay in plaintiff's bringing suit, but rather arose out of the contract's provision that the property would be valued as of the exercise date of the option. This prejudice cannot support defendants' claim of laches.

With respect to the availability of defendants' witness, Steven Kenney, defendants cite to no evidence in the record supporting their assertions. We have found none. The record reveals that Mr. Kenney was deposed, and he also submitted an affidavit on defendants' behalf. We, therefore, affirm the trial court's dismissal of defendants' laches defense.

Affirmed.

Judges WYNN and CALABRIA concur.