Dunn Holdings I, Inc. v. Confluent Health LLC, 2018 NCBC 89.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 9321

DUNN HOLDINGS I, INC.
(previously DUNN PHYSICAL
THERAPY, INC.), a North Carolina
corporation, Individually and
Derivatively on behalf of
BREAKTHROUGH CARY PT, LLC;
CHRISTOPHER F. DUNN; and
THERESA M. DUNN,

Plaintiffs,

v.

CONFLUENT HEALTH LLC, a
Delaware limited liability company;
LAURENCE N. BENZ, Manager of
Breakthrough Cary PT, LLC;
BREAKTHROUGH CARY PT, LLC,
a North Carolina limited liability
company; MARK F. WHEELER;
JEFFREY HATHAWAY; and
BREAKTHROUGH PHYSICAL
THERAPY, INC.,

Defendants.

ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

THIS MATTER comes before the Court on Defendants Confluent Health LLC;

Laurence N. Benz; Breakthrough Cary PT, LLC; Mark F. Wheeler; Jeffrey Hathaway;

and Breakthrough Physical Therapy, Inc.'s (collectively, "Defendants") Motion to

Dismiss ("Motion"; ECF No. 48).

THE COURT, having considered the Motion, the briefs in support of and in

opposition to the Motion, the exhibits attached to the Second Amended Complaint

and the briefs, the arguments of counsel at the hearing, and other appropriate

matters of record, concludes that the Motion should be GRANTED, in part, and

DENIED, in part, for the reasons set forth below.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP, by J. Mitchell Armbruster for Plaintiffs Dunn Holdings I, Inc.; Christopher Dunn; and Theresa Dunn.*

*Stites & Harbison PLLC, by Chadwick A. McTighe (pro hac vice) and Timothy D. Thompson (pro hac vice), and Robinson, Bradshaw & Hinson, P.A., by Edward F. Hennessey, IV for Defendants Confluent Health LLC; Laurence N. Benz; Breakthrough Cary PT, LLC; Mark F. Wheeler; Jeffrey Hathaway; and Breakthrough Physical Therapy, Inc.*

McGuire, Judge.

<u>FACTS AND PROCEDURAL BACKGROUND</u>

1.     The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.  N.C.G.S. § 1A-1, Rule 12(b)(6) (hereinafter, the North Carolina Rules of Civil Procedure will be referred to as "Rule(s)").  The Court only recites those facts included in the Second Amended Complaint that are relevant to the Court's determination of the Motion.  *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).

2.     In 1998, Christopher Dunn ("Christopher") and Theresa Dunn ("Theresa") (collectively, "the Dunns") founded Dunn Physical Therapy, Inc., which later became Dunn Holdings I, Inc. (Dunn Physical Therapy, Inc., and Dunn Holdings I, Inc. are collectively referred to as "Dunn PT").  (2d Am. Compl., ECF No. 36.2, at ¶ 1.)  Dunn PT operated four physical therapy offices in Wake County, North Carolina.  (*Id.* at ¶ 26.)

3.     Laurence N. Benz ("Benz") owned PT Development, LLC, which itself owned several physical therapy practices in North Carolina and across the country. (*Id.* at ¶¶ 14, 28.)

4.     Mark D. Wheeler and Jeffrey Hathaway ("Hathaway") are former members of PT Development, LLC.  (*Id.* at ¶¶ 17, 18.)

A.     *The Sales Transaction and financing of the sale*

5.     In 2014, the Dunns began to negotiate with Benz about Benz purchasing a majority interest in Dunn PT.  Benz told the Dunns that PT Development, LLC's business model is to buy a majority stake in successful physical therapy practices but allow the original founders to continue to manage the practices with the support and experience of PT Development, LLC.  (*Id.* at ¶ 24.)  Benz also explained that PT Development, LLC provided all administrative services for a competitive fee, such that overall expenses would be reduced because multiple practices would be sharing expenses and realizing economies of scale.  (*Id.* at ¶ 25.)

6.     In June 2014, the Dunns sold 80% of Dunn PT to a Kentucky limited liability company established by Benz called PT Development Cary, LLC ("PTD Cary").  Benz also created a Kentucky limited liability company called Breakthrough Cary PT, LLC ("Breakthrough Cary") and contributed the 80% interest in Dunn PT to Breakthrough Cary.  The Dunns then contributed their remaining 20% of Dunn PT to Breakthrough Cary (the sale of Dunn PT's interest and the contribution of its remaining 20% interest to Breakthrough Cary hereinafter is referred to as the "Sales Transaction").  Consequently, after the transaction was completed, PTD Cary and

Dunn PT were the two members of Breakthrough Cary, with PTD Cary owning an 80% interest and Dunn PT owning a 20% interest. (*Id.* at ¶¶ 29–30.) On June 2, 2014, PTD Cary and Dunn PT executed an Operating Agreement for Breakthrough Cary ("Operating Agreement"). (ECF No. 50.1.) The Operating Agreement named Benz as the manager of Breakthrough Cary.

7.      Benz financed a portion of the purchase price paid to the Dunns through a Seller Note payable from Breakthrough Cary to Dunn PT (the "Acquisition Debt"). (*Id.* at ¶ 33.) The Dunns expressed concern that the Acquisition Debt would be paid back directly out of Breakthrough Cary's profits, meaning that 20% of the debt would be paid by the Dunns, and told Benz that they did not want "to be in the position of 'paying themselves.'" (*Id.* at ¶¶ 33–35.) Benz assured the Dunns that the debt would be paid "'below the line' and, accordingly, would not have any effect on their distributions or the value of their interest in [Breakthrough Cary]." (*Id.* at ¶ 36.) Based on Benz's assurances, the Dunns agreed to go forward with the sale. (*Id.*) However, Plaintiffs allege that Benz ultimately did not pay the debt "below the line," but instead used Dunn PT's share of Breakthrough Cary's profits to repay the Acquisition Debt. (*Id.* at ¶ 4.)

*B.      Failure to make distributions and the Distribution Agreement*

8.      During negotiation of the Sales Transaction, the Dunns sought assurances from Benz that they would receive regular distributions from Breakthrough Cary. (*Id.* at ¶¶ 41, 43.) The Operating Agreement gave Benz, as manager, the discretion to make distributions once Breakthrough Cary had cash

reserves of 1.5 times the company's monthly expenses. (*Id*. at ¶ 42.) Benz "assured the Dunns that he planned to make regular distributions once the cash reserve threshold was met" and that they "could expect to start receiving distributions in or around the sixth month following the closing of the sale." (*Id*. at ¶¶ 44–45.) Plaintiffs allege that because the Acquisition Debt was paid out of Breakthrough Cary's profits and not "below the line," the company never met the cash reserve requirements and never paid distributions. (*Id*. at ¶ 46.)

9. In July 2016, in response to the Dunns' complaints about the lack of distributions, Hathaway sent an email to Christopher memorializing an agreement (the "Distribution Agreement") under which Christopher would receive quarterly distributions from Breakthrough Cary. (ECF No. 36.2, Ex. B.) The email stated as follows:

> You had asked me to put in writing the mechanics or agreement on your distribution from BreakThrough Cary. Below is an outline – pretty simple! Christopher Dunn Distribution Agreement: Starting in Q2 2016 Distributions from BreakThrough Cary will be as follows: 1. At the end of each quarter the EBIDTA after OHA will be calculated taking out the debt costs (interest, etc.) from the sale of Dunn PT to BT Cary. 2. Assuming there are no losses to be made up from the previous quarters (initially starting with Q1 2016) then 20% of the net profits will be paid to Christopher Dunn[.]
>
> Let me know if you have any concerns or questions.
>
> Jeff
> Jeffrey W. Hathaway, PT, DPT
> Proactive/Breakthrough PT/Confluent Health

(*Id*.)

10. Breakthrough Cary subsequently paid the Dunns distributions for the second and third quarters of 2016 but did not make any further distributions. (ECF No. 36.2, at ¶ 51.)

C. *The Roll-up Transaction and Dunn PT's "Tag-along Rights"*

11. In October 2014, PTD Cary notified the Dunns that PTD Cary intended to participate in a reorganization, whereby PTD Cary's 80% ownership interest in Breakthrough Cary would be transferred to Confluent Health, LLC ("Confluent"), an entity that Benz substantially owns. (*Id*. at ¶ 91.) In exchange, the owners of PTD Cary would receive ownership interests in Confluent (hereinafter the "Roll-up Transaction"). (*Id*.)

12. Plaintiffs allege that under Breakthrough Cary's Operating Agreement, Dunn PT also had the right to participate in the Roll-up Transaction (the "Tag-along Rights"). (*Id*. at ¶¶ 91–96.) The Operating Agreement provides that:

> If [the Seller] proposes to transfer in a sale . . . Membership Interests representing fifty percent (50%) or more of the then outstanding Membership Interests of the Company . . . then the other Members (collectively, the 'Tag-Along Sellers') shall have the right . . . to require the proposed purchaser(s) to purchase from such Tag-Along Sellers their Membership Interest(s) . . . at the same price per unit and upon the same terms as offered by the [purchaser(s)].

(ECF No. 50.1, at § 18.1.) Dunn PT's Tag-along Rights as the Tag-Along Sellers were triggered under the Operating Agreement when the Seller (PTD Cary) sought to transfer its 80% interest in Breakthrough Cary to Confluent.

13.     The Dunns notified Benz that Dunn PT wished to sell its interest in Breakthrough Cary to Confluent pursuant to the Tag-along Rights. Benz eventually agreed to offer Dunn PT a right to participate in the Roll-up Transaction, but only to transfer 50% of its membership in Breakthrough Cary to Confluent, and in a manner that Plaintiffs allege "deeply devalued" Dunn PT's interest in Breakthrough Cary. (*Id.* at ¶¶ 94–96.) Dunn PT did not accept the offer. Nevertheless, on December 22, 2014, Dunn PT executed an "Acknowledgment and Consent" authorizing PTD Cary to distribute its membership interests to Benz, Hathaway, and Wheeler, and the contribution of their membership interests to Confluent. ("Acknowledgment and Consent," ECF No. 50.6.)

14.     Following the Roll-up Transaction, Confluent became an 80% owner of Breakthrough Cary.

D.     *Management Services Agreement and improper expenses charged to Breakthrough Cary*

15.     Contemporaneously with the Sales Transaction, "Benz, on behalf of both PT Development and Breakthrough Cary, executed a Management Services Agreement pursuant to which PT Development was to provide certain administrative and management services to Breakthrough Cary, including without limitation, certain accounting, billing, collections, marketing, and human resources services in exchange for a monthly management fee equal to 7% of the Company's gross collections." (ECF No. 36.2, at ¶ 56.)

16.    Plaintiffs allege that despite their complaints, Benz and Confluent have regularly charged Breakthrough Cary for expenses that are not Breakthrough Cary's responsibility and should not have been charged to the company. (*Id*. at ¶¶ 57–80.)

E.    *Interference with Christopher's management of Breakthrough Cary*

17.    As part of the Sales Transaction, Christopher executed an employment agreement with Breakthrough Physical Therapy, Inc. ("Employment Agreement"). (*Id*. at ¶ 160; Empl. Agreement, ECF No. 50.5.) Under Article 14 of the Operating Agreement, Benz, as manager, is to manage the business and affairs of the Company. (ECF No. 36.2, at ¶ 158.) Although Benz served as manager of Breakthrough Cary, Benz promised that Christopher would continue to manage the day-to-day operations of the physical therapy practice and delegated to Christopher those management responsibilities. (*Id*. at ¶¶ 32, 160.) Despite Benz's promise, however, Hathaway began "assert[ing] himself more and more directly" into the management of Breakthrough Cary to "usurp Christopher's day to day management responsibilities and authority." (*Id*. at ¶¶ 82, 84.) Hathaway changed the name of Breakthrough Cary's locations from "Dunn Physical Therapy" to "Breakthrough Physical Therapy," and in July 2017, Hathaway informed Christopher that he had been the CEO of Breakthrough Cary since 2015. (*Id*. at ¶¶ 88, 90.)

F.    *The Non-compete Agreements*

18.    In conjunction with the Sales Transaction, Breakthrough Cary entered into Noncompetition, Nonsolicitation, and Nondisclosure Agreements with Christopher and Theresa (the "Non-compete Agreements"). (*Id*. at ¶¶ 164–75; ECF

Nos. 50.3 and 50.4.) The Non-compete Agreements restrict Christopher and Theresa from having any relationship whatsoever with a physical therapy business for a period of five years following execution of the agreements and in a territory encompassing a 25 mile radius around Breakthrough Cary's office locations. (ECF No. 36.2, at ¶¶ 168–69.) The Employment Agreement also contains a non-compete provision placing similar restrictions on Christopher. (*Id*. at ¶ 165.) Plaintiffs now allege that the restrictions are overbroad and unenforceable.

### G. *Procedural history*

19. Plaintiffs filed their first Complaint in this matter on July 28, 2017. (ECF No. 3.) Plaintiffs subsequently filed an Amended Complaint on November 6, 2017. (ECF No. 7.) Defendants moved to dismiss the Amended Complaint on December 1, 2017 (ECF No. 16), and the motion became ripe on January 11, 2018. (ECF No. 45.)

20. On December 22, 2017, Plaintiffs filed a Motion to Amend Complaint. (ECF No. 36.) The Court granted the Motion to Amend Complaint on January 30, 2018 and deemed the Second Amended Complaint to have been filed and served upon Defendants on January 30, 2018. (ECF No. 47.) The Second Amended Complaint alleges claims for: breaches of contract; breach of fiduciary duty; judicial dissolution; appointment of a receiver; declaratory judgment declaring the Non-compete Agreements invalid; unfair and deceptive trade practices; constructive fraud; and fraud. (ECF No. 36.2, at ¶¶ 127–98.)

21. On March 1, 2018, Defendants filed the Motion. (ECF No. 48.) Defendants move to dismiss under Rules 12(b)(1) and 12(b)(6). (*Id.*) On March 26, 2018, Plaintiffs filed a response to the Motion (ECF No. 52), and Defendants filed their reply on April 9, 2018 (ECF No. 54). The Court subsequently held a hearing on the Motion. During the hearing, the Court directed the parties to file supplemental briefing on the issue of whether Plaintiffs adequately alleged that Confluent is a successor to PTD Cary for purposes of imposing liability on Confluent. The parties subsequently filed the supplemental briefs. (Defs.' Suppl. Br., ECF No. 57; Pls.' Suppl. Br., ECF No. 58.) The Motion is now ripe for resolution.

## ANALYSIS

### A. *Standards of review*

22. Dismissal under Rule 12(b)(1) is proper "[i]f a party does not have standing to bring a claim [because] a court has no subject matter jurisdiction to hear the claim." *Estate of Apple v. Commercial Courier Express, Inc.*, 168 N.C. App. 175, 177, 607 S.E.2d 14, 16 (2005). When considering a motion to dismiss for lack of standing, the Court must "view the allegations as true and the supporting record in the light most favorable to the non-moving party." *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008).

23. The burden is on the party invoking jurisdiction to establish standing. *Marriot v. Chatham Cty.*, 187 N.C. App. 491, 494, 654 S.E.2d 13, 16 (2007). The Court will only grant a Rule 12(b)(1) motion "if the material jurisdictional facts are not in dispute and the moving party is entitled to a judgment as a matter of law." *Wilkie v.*

*Stanley*, 2011 NCBC LEXIS 11, \*10 (N.C. Super. Ct. Apr. 20, 2011) (citing *Southstar Funding, L.L.C. v. Warren, Perry & Anthony, P.L.L.C.*, 445 F. Supp. 2d 583, 584 (E.D.N.C. 2006)).

24. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the [C]omplaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). North Carolina is a notice pleading state. *See, e.g.*, *Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 646, 762 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought." *Id.*

25. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). In deciding a motion to dismiss, the Court must construe the Complaint liberally and accept all well-pleaded allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). The Court, however, is not required "to accept as true

allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citations and quotation marks omitted). In addition, the Court may consider documents that are the subject of Plaintiff's Complaint and to which the Complaint specifically refers. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

B. *Successor liability*

26. As an initial matter, Defendants argue that Plaintiffs cannot make claims against Confluent as the successor to PTD Cary because PTD Cary is now dissolved and Confluent is not a successor in interest to PTD Cary. (ECF No. 57, at p. 2.) Plaintiffs, however, argue that Confluent is the legal successor in interest to PTD Cary and that, in any event, Plaintiffs are permitted to sue former members of a dissolved LLC under Kentucky law.[1] (ECF No. 58, at pp. 4, 7.)

27. Under Kentucky law, "[i]t is generally accepted . . . that a corporation which purchases another corporation does not assume the payment of any debts or liabilities of the corporation which it has purchased." *Pearson v. Nat'l Feeding Sys.*, 90 S.W.3d 46, 49 (Ky. 2002) (citing *Am. Railway Express Co. v. Commonwealth*, 228 S.W. 433, 436–37 (Ky. 1920)). However, there are four exceptions to this rule:

> (1) where the purchaser expressly or impliedly agrees to assume such debts or other liabilities; (2) where the transaction amounts to a consolidation or merger of the seller and purchaser; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4)

---

[1] PTD Cary was created under Kentucky law. (ECF No. 36.2, at ¶ 2.) The parties both make their arguments regarding successor liability referencing Kentucky law. (ECF No. 57, at pp. 2–3; ECF No. 58, at pp. 4, 6–7.)

> where the transaction is entered into fraudulently in order to escape liability for such debts.

*Id.*

28. Plaintiffs have not alleged, and neither party contends, that PTD Cary "sold" its assets to Confluent. Rather, Plaintiffs allege, and Defendants do not dispute, that PTD Cary transferred its ownership interest to Confluent in what Plaintiffs describe as a "roll-up." (ECF No. 36.2, at ¶ 31.) The Acknowledgment and Consent in which the parties consented to the transfer states that PTD Cary "distribute[d]" its interest to the members (Benz, Hathaway, and Wheeler), and the members "contribute[d]" the interests in PTD Cary to Confluent "in exchange for limited liability company interests in Confluent." (ECF 57.1, at p. 1.) The allegations do not suggest an arms-length purchase of PTD Cary by Confluent, but rather a restricting of PTD Cary's ownership interest in Breakthrough Cary between close business associates.

29. In addition, Plaintiffs expressly allege that Confluent is a "successor" to PTD Cary's membership interest in Breakthrough Cary. (ECF No. 36.2, at ¶¶ 13, 133.) Plaintiffs also contend that the provisions of the Operating Agreement regarding transfers of membership interests strongly support the notion that Confluent should be considered a successor for purposes of the claims raised in this lawsuit. (ECF No. 58, at pp. 2–3.) Section 16.1 of the Operating Agreement, entitled "Restrictions on Transfer," provides in relevant part as follows:

> The Transfer of an Interest pursuant to this Article 16, or otherwise, shall not release the assigning Member from such Member's obligations under this Agreement unless

the transferee of such Interest is approved by the vote of Members holding all of the Participating Percentages as a substituted Member, *and the approved assignee assumes in writing the obligations of the assigning Member*. The approved Transfer pursuant to this paragraph 16.1 shall confer upon the assignee the right to become a substituted Member, in the following manner and subject to the following conditions: . . .

(iv) *Each assignee shall agree in writing to be subject to and bound by the terms of this Agreement as if originally a party to this Agreement*.

(ECF No. 50.1, at § 16.1) (emphasis added). Plaintiffs argue that this language either expressly or impliedly, creates successor liability obligations on Confluent as the transferee of PTD Cary. (ECF No. 58, at pp. 2–3.)

30. Finally, Plaintiffs argue that the allegations in the Second Amended Complaint support the conclusion that the transfer of PTD Cary's interests to Confluent amounted to a consolidation of merger and that Confluent's ownership of the interest was a mere continuation of PTD Cary's interest. (*Id.* at pp. 4–5.) Indeed, the allegations do not suggest that Breakthrough Cary's operations changed in any significant way after the transfer of membership interest.

31. The Court concludes that, at this early stage of the proceedings, Plaintiffs have adequately alleged that Confluent is the successor to PTD Cary for purposes of imposing liability on Confluent. Accordingly, the Court need not address at this time Plaintiffs' allegations concerning the potential individual liability of Benz, Hathaway, and Wheeler.

## C. *Standing to bring direct and derivative claims*

32. Plaintiffs allege that Confluent breached fiduciary duties to Dunn PT and committed constructive fraud "by engaging in self-dealing and engaging in financial transactions and accounting decisions which have benefited Defendants Confluent and/or Benz to the detriment of Plaintiff Dunn PT," (ECF No. 36.2, at ¶142), and by making misrepresentations that the acquisition debt would be kept "below the line' and "regarding distributions, expenses, acquisition indebtedness treatment, and other matters." (*Id*. at ¶¶ 184–85, 193.) Plaintiffs further allege that "to the extent Dunn PT can only recover on [these] claim[s] derivatively" the claims are "also asserted as [ ] derivative claim[s]." (*Id*. at ¶¶ 146, 187.) Defendants argue that Dunn PT's claims for breach of fiduciary duty and constructive fraud against Confluent should be dismissed pursuant to Rule 12(b)(1) because Dunn PT lacks standing to pursue those claims directly or derivatively on behalf of Breakthrough Cary. Defendants contend that Dunn PT has failed to allege direct claims against Confluent and that Dunn PT did not make a proper derivative demand that would enable them to assert the claims derivatively. (Mem. Supp. Defs.' Mot. Dismiss Pls.' Second Am. Compl., ECF No. 49, at pp. 14–16.)

33. Defendants argue that the alleged actions of Confluent can only have harmed Breakthrough Cary, "with any harm to [Dunn PT] flowing from its membership interest in Breakthrough Cary." (*Id*. at p. 14.) Any harm to Dunn Holdings could "give rise only to claims by Breakthrough Cary, and so any possible claim would be derivative." (*Id*. at p. 6.) Plaintiffs counter that Confluent owed Dunn

PT a fiduciary duty as majority, controlling member of Breakthrough Cary, and that Dunn PT is permitted to bring an individual action against Confluent for breaches of that duty. (ECF No. 52, at p. 16.)

34. Under North Carolina law, a controlling member of an LLC owes a fiduciary duty to minority members. *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473, 675 S.E.2d 133, 137 (2009); *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, *25–26 (N.C. Super. Ct. Oct. 21, 2016) (holding that defendant, as a majority member of the LLC, owed a fiduciary duty to plaintiff, a minority member of the LLC); *see also Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 405, 537 S.E.2d 248, 259 (2000) ("[M]inority shareholders in a closely held corporation who allege wrongful conduct and corruption against the majority shareholders in the corporation may bring an individual action against those shareholders, in addition to maintaining a derivative action on behalf of the corporation.") Plaintiffs allege that Confluent had an 80% ownership interest in Breakthrough Cary, and was "the controlling majority member of [Breakthrough Cary]." (ECF No. 36.2, at ¶¶ 2, 118.) Therefore, Plaintiffs have alleged Confluent owed Dunn PT a fiduciary duty, and Dunn PT may pursue its own individual claims for breach of fiduciary duty and constructive fraud against Confluent.

35. Defendants also assert that Plaintiffs did not make a proper derivative demand on Breakthrough Cary that would enable Dunn PT to bring its claims for breach of fiduciary duty or constructive fraud. Since Plaintiffs plead the derivative claims only in the alternative, and the Court already has concluded that Dunn PT

may pursue direct claims for breach of fiduciary duty and constructive fraud, the Court need not address Defendants' argument.

36. Defendants' Motion to Dismiss Plaintiffs' claims for breach of fiduciary duty and constructive fraud should be DENIED to the extent those claims allege direct, non-derivative claims. In addition, Plaintiffs' claims for breach of fiduciary duty and constructive fraud should be DISMISSED AS MOOT to the extent those claims allege derivative claims.

D. *First Claim for Relief: Breach of Contract – Tag-Along Rights*

37. In their First Claim for Relief, Plaintiffs allege that Confluent breached the Operating Agreement regarding the Tag-along Rights. Plaintiffs allege that "[t]he Confluent Roll-up in October 2014 triggered Dunn PT's Tag-along Rights under the Operating Agreement, and Benz and PTD Cary (now Confluent) breached the Operating Agreement by not allowing Dunn PT to fully participate in the Roll-up at the fair value of their equity stake, which it would have done if permitted." (*Id.* at ¶ 129.) Defendants contend that this claim should be dismissed because (a) Dunn PT waived any breaches of the Operating Agreement by signing the Acknowledgment and Consent allowing the transfer of PTD Cary's interest to Confluent, (ECF No. 49, at pp. 8–9), and (b) Plaintiffs have not alleged a breach because Dunn PT's only remedy for Confluent's refusal to purchase Dunn PT's interests was to invoke Section 18.2 of the Operating Agreement blocking PTD Cary's transfer of its interests to Confluent. (*Id.* at pp. 9–10.) Plaintiffs, on the other hand, argue that (a) the Court cannot consider the Acknowledgment and Consent because it is not expressly

referenced in the Second Amended Complaint; (b) Defendants' waiver argument is not properly considered on a motion to dismiss under Rule 12(b)(6); and (c) Plaintiff has sufficiently alleged a breach of the Tag-along Rights. (ECF No. 52, at pp. 9–13.)

38. As a preliminary matter, the Court concludes that it can properly consider the Acknowledgment and Consent in deciding the Motion. Although Plaintiffs do not expressly refer to the Acknowledgment and Consent in their allegations, the Roll-up Transaction is one of the primary transactions that is the subject of the claims in this lawsuit. *Oberlin Capital, L.P.*, 147 N.C. App. at 60, 554 S.E.2d at 847 (the "consideration of a contract which is the subject matter of an action does not expand the scope of a 12(b)(6) hearing and does not create justifiable surprise in the nonmoving party.").

39. The Court also believes that it can properly consider Defendants' waiver defense under the circumstances of this case. Although there is North Carolina case law suggesting that it may not be proper to consider an affirmative defense on a motion to dismiss under Rule 12(b)(6) motion, *see Brooks Distributing Co v. Push*, 91 N.C. App. 715, 723–24, 373 S.E.2d 300, 305 (Cozort, J., dissenting), *rev'd per curiam* 324 N.C. 326, 378 S.E.2d 31 (1989), more recent cases have permitted consideration of statute of limitations defenses raised by motion to dismiss. *Johnson v. North Carolina DOT*, 107 N.C. App. 63, 66–67, 418 S.E.2d 700, 702 (1992) ("Absent a showing of prejudice, an affirmative defense may be raised by a Rule 12(b)(6) motion to dismiss."); *Carlisle v. Keith*, 169 N.C. App. 674, 687, 614 S.E.2d 542, 551 (2005) ("This Court has held that a trial court may consider a statute of limitations defense,

though not raised in a motion to dismiss, when the non-movant has not been surprised and has full opportunity to argue and present evidence on the affirmative defense." (citations and quotation marks omitted)).  Plaintiffs do not argue that they are prejudiced by Defendants' waiver argument, and they cannot be surprised by a defense based on the Acknowledgment and Consent, to which Dunn PT is a party. Under the circumstances of this case, the Court concludes that it is appropriate to consider Defendants' argument that Plaintiffs waived the claim for breach of the Tag-along Rights.

40.    The Supreme Court of North Carolina has held that

> It is well established that a written contract may be waived, and the provisions in a contract may be waived. A waiver takes place where a man dispenses with the performance of something which he has a right to exact.  A party may excuse performance expressly or by conduct which naturally and justly leads the other party to believe that performance is dispensed with.  There can be no waiver unless so intended by one party, and so understood by the other, or one party has so acted as to mislead the other. It is a question of intent, which may be inferred from a party's conduct.  Intent is an operation of the mind and should be proven and found as a fact and is rarely to be inferred as a matter of law.

*Harris & Harris Constr. Co. v. Crain & Denbo, Inc.*, 256 N.C. 110, 118–19, 123 S.E.2d 590, 596 (1962) (citation omitted).

41.    Defendants argue that Dunn PT expressly waived its claim for breach of the Tag-along Rights in the Operating Agreement by executing the Acknowledgment and Consent, which contained the following provision:

> Each of the Company and its members and manager hereby irrevocably waives on a one-time basis (a) any

purchase options, rights of first refusal or similar rights that may arise or that may have otherwise arisen under the Operating Agreement or otherwise to purchase the PTD Cary Interest as a result of the transactions described above, and (b) any noncompliance with the terms of the Operating Agreement resulting from the foregoing.

(ECF No. 57.1, at p. 1.) Plaintiffs make several arguments in response. First, Plaintiffs contend that the referenced language does not explicitly waive the Tag-along Rights contained in Article 18 of the Operating Agreement, and is most reasonably interpreted as applying only to claims on non-compliance with Article 16 involving transfers of interest. (ECF No. 52, at p. 10.) Plaintiffs also argue that the Acknowledgment and Consent does not reference any consideration provided to Plaintiffs and therefore cannot alter their rights under the Operating Agreement. (*Id.*) The Court does not find these arguments persuasive. The language in the Acknowledgment and Consent expressly waives "any noncompliance with the terms of the Operating Agreement," and is broad enough to encompass potential claims regarding Tag-along Rights without express mention of those rights. In addition, Plaintiffs have not directed the Court to any North Carolina precedent holding that a contractual right can only be waived in exchange for consideration. To the contrary, the law provides that a person can waive contract rights by words or conduct that "naturally leads the other party to believe that the right has been intentionally given up." *Phoenix Ltd. P'ship v. Simpson*, 201 N.C. App. 493, 500, 688 S.E.2d 717, 722 (2009) (citations and quotation marks omitted).

42. Plaintiffs also argue that since a waiver involves a question of intent, it is ill-suited to resolution on a motion to dismiss. (ECF No. 52, at pp. 10–11.) Plaintiffs

note that "the Roll-up [T]ransaction [ ] includes many documents, e-mails, and other communications" that may bear on whether PT Dunn intended to waive it rights. (*Id.* at p. 10.) The Acknowledgment and Consent does not contain a merger clause purporting to limit its terms to the written provisions of the documents. Accordingly, there may exist other documents and communications surrounding the execution of the Acknowledgment and Consent that would inform the interpretation of the waiver provision.

43. The Court concludes that it is premature at this stage of the case to decide Defendants' waiver defense. Discovery may yield additional information regarding Dunn PT's intent in executing the Acknowledgment and Consent.

44. Finally, Defendants contend Plaintiffs do not allege a claim for breach of the Tag-along Rights because Dunn PT's only recourse for Confluent's refusal to purchase Dunn PT's membership interests in the Roll-up Transaction was to block PTD Cary's transfer of its interests to Confluent pursuant to Section 18.2 of the Operating Agreement. Plaintiffs do not directly respond to Defendants' argument, but instead contend they have adequately alleged a claim for breach of contract to survive dismissal. A breach of contract claim requires that the plaintiff allege (1) the existence of a valid contract and (2) a breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Plaintiffs have adequately alleged, and Defendants do not dispute, that the Operating Agreement was a valid contract. Plaintiffs have also alleged a breach of the Operating Agreement. (ECF No. 5, at ¶ 129.) Accordingly, the Court concludes that Plaintiffs have properly pled

a claim for breach of the Operating Agreement regarding the Tag-along Rights. *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 40, 742 S.E.2d 287, 291 (2013) ("The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract. This Court has held that where the complaint alleges each of these elements, it is error to dismiss a breach of contract claim under N.C. Gen. Stat. § 1A-1, Rule 12(b)(6)." (citations and quotation marks omitted)).

45. Defendants' motion to dismiss the claim for breach of the Tag-along Rights in the Operating Agreement should be DENIED.

E. *Second Claim for Relief: Breach of Contract – Distributions*

46. In their Second Claim for Relief, Plaintiffs allege that Confluent breached the Distribution Agreement by failing to pay any further distributions to Dunn PT after making distributions for the second and third quarters of 2016. (ECF No. 36.2, at ¶¶ 134–38.)

47. Defendants move to dismiss the Second Claim for Relief. Defendants contend that Breakthrough Cary's Operating Agreement gives Benz, as manager, the sole discretion to determine whether to make distributions. (ECF No. 49, at pp. 11–12.) Defendants argue that the Distribution Agreement is not a valid amendment of the Operating Agreement, which requires the written and unanimous approval of Breakthrough Cary's members, and Hathaway is not a member of Breakthrough Cary. (*Id*. at p. 12.) Finally, Defendants argue that even if Breakthrough Cary, through Hathaway, entered into a valid agreement to make distributions, Plaintiffs

allege that Confluent is the party in breach of the Distribution Agreement. (*Id.* at p. 13.)

48. The Operating Agreement states that distributions other than tax distributions "shall be distributed to the Members at such time or times and in such amounts as determined by the Manager in its sole discretion." (ECF No. 50.1, at § 9.1.) The Operating Agreement also provides that "[a]ny amendments to this Agreement . . . shall be in writing and unanimously approved by all members." (*Id.* at § 22.12.) Plaintiffs contend that the Distribution Agreement is a valid amendment to the Operating Agreement, altering the manager's discretion in making distributions, because the Distribution Agreement is in writing and is signed by Hathaway on behalf of Confluent and Breakthrough Cary. (ECF No. 52, at p. 13.) The Court disagrees. First, even if the Distribution Agreement constitutes a sufficient "writing," it is not signed by Dunn PT as required by the Operating Agreement. Second, the Distribution Agreement does not purport to be a formal amendment to the Operating Agreement and does not make reference to the Operating Agreement, much less to Section 9.1 governing distributions. The allegations do not support Plaintiffs' position that the Distribution Agreement was an amendment to the Operating Agreement, or that breach of the Distribution Agreement is a breach of the Operating Agreement.

49. Plaintiffs have, however, adequately alleged that the Distribution Agreement is a separate and valid contract between Dunn PT, or Christopher individually, and Confluent. (ECF No. 36.2, at ¶¶ 50–52, 134, 138.) Defendants do

not argue that Dunn PT or Christopher and Confluent could not enter into agreements separate from and additional to the Operating Agreement. In addition, Plaintiffs allege that Confluent acknowledged the validity of the Distribution Agreement by paying the agreed upon distributions for two quarters.

50. Defendants also argue that Confluent cannot be liable for this alleged breach because it is Breakthrough Cary, not Confluent, that is responsible for paying distributions to its members. (ECF No. 49, at p. 13.) Plaintiffs argue that Hathaway signed the new agreement on behalf of both Breakthrough Cary and Confluent, and because Plaintiffs have alleged that Confluent is the controlling member of Breakthrough Cary, Confluent is essentially the one responsible for making distributions under the new agreement. (ECF No. 52, at pp. 14–15.) At the motion to dismiss stage, the Court accepts these allegations as sufficient to state a breach of the new agreement by Confluent, the controlling member of Breakthrough Cary.

51. Even though Plaintiffs have not adequately alleged a breach of the Operating Agreement regarding distributions, they have alleged a breach of the Distribution Agreement. Defendants' motion to dismiss Plaintiffs' claim for breach of contract regarding the failure to make distributions under the Distribution Agreement is DENIED.

> F. *Fourth and Fifth Claims for Relief: Oppression and Judicial Dissolution, and Appointment of Receiver*

52. In their Fourth Claim for Relief, Plaintiffs seek a judicial dissolution of Breakthrough Cary under N.C. Gen. Stat. § 57D-6-02 (hereinafter, "G.S."). In their Fifth Claim for Relief, Plaintiffs seek the appointment of a receiver over

Breakthrough Cary under G.S. § 57D-6-04 to oversee the dissolution. Plaintiffs allege that dissolution is necessary because "[u]nder the present circumstances, it is not practicable to continue to conduct the business of Breakthrough Cary in conformance with the Operating Agreement and Chapter 57D of the North Carolina General Statutes." (ECF No. 36.2, at ¶ 149.) Plaintiffs allege that a "receiver is necessary to protect the interest of the minority member Plaintiff, to prevent the continued allocation of inappropriate expenses to Breakthrough Cary, to provide for distributions as agreed upon by the members, to conduct an accounting, and for other appropriate relief." (*Id*. at ¶ 156.)

53. Defendants seek dismissal of the claims for dissolution and appointment of a receiver contending that the allegations do not support dissolution and the remedies are "improper and unnecessary." (ECF No. 49, at p. 17.)

54. G.S. § 57D-6-02 provides that "[t]he superior court may dissolve an LLC in a proceeding brought by . . . [a] member, if it is established that (i) it is not practicable to conduct the LLC's business in conformance with the operating agreement and this Chapter or (ii) liquidation of the LLC is necessary to protect the rights and interests of the member." Plaintiffs' allegations are more than sufficient to support the requested relief on grounds that it is not practicable to conduct the LLC's business given the parties' disputes and their current relationship. Plaintiffs also allege improprieties by Confluent and Benz that would support the claim that dissolution is necessary to protect Dunn PT's interests. Defendants' motion to

dismiss Plaintiffs' requests for judicial dissolution and appointment of a receiver should be DENIED.

G.  *Sixth Claim for Relief: Breach of Contract – Management of Company*

55.  In their Sixth Claim for Relief, Plaintiffs allege that Defendants breached the Operating Agreement by appointing Hathaway as CEO of Breakthrough Cary.  Plaintiffs claim that Benz, as manager, delegated to Christopher the responsibility for the day-to-day operations of Breakthrough Cary and that the purported appointment of Hathaway impaired Christopher's ability to conduct those operations.  (ECF No. 36.2, at ¶¶ 160, 162.)

56.  The Operating Agreement provides that Benz, as manager, "shall be entitled to delegate certain duties to another person pursuant to the terms of a management agreement entered into by and between such party and [Breakthrough Cary]."  (ECF No. 50.1, at § 14.3.)  The Operating Agreement places no specific restriction on the persons to whom Benz can delegate duties or the particular duties he can delegate.  In addition, G.S. § 57D-3-22 provides general authority to a manager of a limited liability company to "delegate authority to act on behalf of the LLC to persons other than managers."

57.  Plaintiffs argue that the Operating Agreement "does not provide for the appointment of a Chief Executive Officer" because the Operating Agreement only states that the manager may delegate certain duties to "another person," not multiple people, and those duties had already been delegated to Christopher.  (ECF No. 36.2, at ¶ 161; ECF No. 52, at pp. 20–21.)  Defendants contend that this is a

misinterpretation of the Operating Agreement, which simply authorizes the manager to delegate certain duties to whomever he chooses pursuant to a "management agreement." (ECF No. 50.1, at § 14.3.) Defendants further note that Plaintiffs have alleged that Christopher was not bestowed his duties pursuant to a "management agreement," but rather pursuant to an employment agreement. (ECF No. 36.2, at ¶ 160; ECF No. 49, at p. 20.)

58. The Court agrees with Defendants' arguments. The Court concludes that the language of the Operating Agreement does not preclude the manager from delegating duties to one or more persons under Section 14.3. Nonetheless, even if Section 14.3 were to be read as only allowing for delegation to one other person pursuant to a management agreement, Plaintiffs have only alleged that Christopher signed an employment agreement, not a management agreement. (ECF No. 36.2, at ¶ 160.) Defendants' Motion to Dismiss Plaintiffs' claim for breach of contract regarding the management of the company is GRANTED.

*H.     Seventh Claim for Relief: Declaratory Judgment*

59. Plaintiffs' Seventh Claim for Relief seeks a declaratory judgment declaring that the non-compete restrictions in the Non-compete Agreements and the Employment Agreement are unenforceable because they are overbroad as to time, geographic territory, and the scope of activities from which Christopher and Theresa are restricted. (ECF No. 36.2, at ¶¶ 164–75.) Defendants move to dismiss this claim arguing that the non-compete provisions are valid, reasonable, and enforceable under

North Carolina law and therefore the claim should be dismissed. (ECF No. 49, at pp. 20–22.)

60. A covenant not to compete related to the purchase of a business will be enforced if it is (1) "necessary to protect the legitimate interest of the purchaser"; (2) "reasonable with respect to both time and territory"; and (3) "if it does not interfere with the interest of the public." *Beverage Sys. of the Carolinas LLC v. Assoc. Bev. Repair LLC*, 368 N.C. 693, 698, 784 S.E.2d 457, 461 (2016). North Carolina courts will enforce a covenant not to compete entered into as part of an employment contract if it is: "(1) in writing; (2) reasonable as to [the] terms, time, and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990); *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649–50, 370 S.E.2d 375, 380 (1988). "The reasonableness of a non-competition covenant is a matter of law for the court to decide." *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009); *Sandhills Home Care, L.L.C. v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, *13 (N.C. Super. Ct. Aug. 1, 2016).

61. To plead a valid claim for declaratory judgment, a plaintiff must plead "all facts necessary to disclose the existence of an actual controversy between the parties to the action with regard to their respective rights and duties." *Lide v. Mears*, 231 N.C. 111, 118, 56 S.E.2d 404, 409 (1949). The Court concludes that Plaintiffs have alleged the existence of an actual controversy between the parties over

the enforceability of the non-compete restrictions sufficient to support a claim for declaratory judgment at the motion to dismiss stage. Defendants' motion to dismiss Plaintiff's claim for declaratory judgment should be DENIED.

*I. Tenth Claim for Relief: Fraud*

62. In their Tenth Claim for Relief, Plaintiffs allege that Benz and Confluent made various fraudulent representations to the Dunns. (ECF No. 36.2, at ¶¶ 190–98.) Plaintiffs make these claims as direct claims and, alternatively, as derivative claims. (*Id.* at ¶ 197.)

63. In order to state a claim for fraud, a plaintiff must allege: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).

64. The Dunns allege that Benz represented that the Acquisition Debt would be kept "below the line" so that the Dunns would not be paying themselves for any of the debt. (ECF No. 36.2, at ¶¶ 192–93.) Plaintiffs further allege that at the time Benz made the representations, he did not intend to honor them. (*Id.* at ¶ 191.)

65. Plaintiffs also allege that Benz and Confluent represented that they would "act in the best interest" of Breakthrough Cary, and that "Benz/Confluent and Jeff Hathaway promised to start making regular distributions to Dunn PT in July 2016 . . . but later abandoned that agreement," and that Defendants promised to

resolve various accounting and expense issues but have failed to do so. (*Id.* at ¶¶ 192, 194–95.)

66. Defendants first argue that Plaintiffs' fraud claim should be dismissed because the claim is derivative in nature, and Plaintiffs did not properly bring a derivative claim. (ECF No. 49, at p. 24.) With regard to the fraud claim based on Benz's promise that the Acquisition Debt would be kept "below the line," the Court disagrees. "There are two major, often overlapping, exceptions to the general rule that a shareholder cannot sue for injuries to his corporation: (1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, and (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658-659, 488 S.E.2d 215, 219-220 (1997) (citations and quotation marks omitted). Plaintiffs allege that they were induced into the Sales Transaction and becoming members in Breakthrough Cary and would not have sold their interests in Dunn PT but for Benz's misrepresentation. (ECF No. 36.2, at ¶ 193.) Plaintiffs' allegations state a direct claim under the special duty or separate injury exceptions. *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 398, 537 S.E.2d 248, 254–55 (2000) ("[O]ur appellate courts allow shareholders to bring individual actions against third parties who induce them to make corporate investments which prove to be worthless."); *Energy Investors Fund, L.P. v. Metric Constr., Inc.,* 133 N.C. App. 522, 524, 516 S.E.2d 399, 401 (1999) ("Special duties [under *Barger*] have been found when, for instance, a third party . . . induced the shareholder to buy stock in the first

place . . . ."); *see also Spoor v. Barth*, 244 N.C. App. 670, 684, 781 S.E.2d 627, 636–37 (2016) (finding that plaintiff had standing to sue defendants directly because they were fraudulently induced into investing in a corporation, which constituted an injury "separate and distinct" from the other shareholders); *Newton v. Barth*, 788 S.E.2d 653, 659–61, 2016 N.C. App. LEXIS 776, *11–19 (2016) (same). Defendants' argument that Plaintiffs' claim for fraud based on Benz's misrepresentation about the treatment of the Acquisition Debt must fail.

67. With regard to Plaintiffs' fraud claim based on the failure to receive distributions under the Distribution Agreement, there is no allegation that the failure to make distributions to Dunn PT resulted in any harm to Breakthrough Cary that would give rise to a claim by the LLC. Plaintiffs' claim for fraud based on the failure to pay distributions under the Distribution Agreement is not a derivative claim, but instead is an individual claim belonging to Dunn PT or Christopher.

68. Plaintiffs' allegations that Benz promised that Confluent would act in the best interests of Breakthrough Cary and promised to resolve the expense issues is simply a repackaging of their claims for breach of fiduciary duty and constructive fraud and do not state separate claims for fraud.

69. Plaintiffs have adequately pleaded claims for fraud regarding Benz's representation that the Acquisition Debt would be paid "below the line" and based on the failure to pay distributions under the Distribution Agreement. Defendants' motion to dismiss Plaintiffs' claim for fraud based on these allegations should be DENIED. Defendants' motion to dismiss Plaintiffs' claim for fraud based on the

allegations that Benz promised that Confluent would act in the best interests of Breakthrough Cary and promised to resolve the expense issues should be GRANTED.

J.     *Eighth Claim for Relief: Unfair and Deceptive Trade Practices*

70.     Plaintiffs' Eighth Claim for Relief alleges that Defendants "engaged in unfair or deceptive acts in or affecting commerce, in violation of [G.S.] § 75-1.1." (ECF No. 36.2, at ¶ 177.)  Plaintiffs allege that

> Benz and Confluent have developed a business model of "partnering" with smaller practices with promises of growth, support, and reduced expenses, only to saddle their "partners" with excessive and inappropriate expenses (to the benefit of Confluent/Benz).  These practices reduce the alleged value of the partners' shares, and then allow Confluent to buy out the partners at an artificially low valuation.

(*Id.* at ¶ 180.)  Although the Second Amended Complaint is less than clear about which specific wrongful acts by Defendants form the basis of the unfair and deceptive practices, the Court concludes that the claim is premised on Benz's alleged misrepresentations to the Dunns during the negotiations of the Sales Transaction.

71.     "To establish a prima facie case of unfair and deceptive trade practices, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice, (2) the act was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 303, 603 S.E.2d 147, 161 (2004).  "Plaintiff[s] must first establish that [D]efendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991).  The phrase "'business activities' [ ] connotes the manner in which businesses

conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010) (citations and quotation marks omitted); *Alexander v. Alexander*, 792 S.E.2d 901, 904, 2016 N.C. App. LEXIS 1252, *7 (N.C. Ct. App. Dec. 6, 2016).

72.     "With the [UDTPA] our General Assembly sought to prohibit unfair or deceptive conduct in interactions between different market participants.   The General Assembly did not intend for the Act to regulate purely internal business operations."   *White*, 364 N.C. at 47–48, 691 S.E.2d at 676 (holding that conduct between partners in a business, even when the conduct involves multiple business entities owned by the partners, is nonetheless internal to a single market participant).   "The [UDTPA] is not focused on the internal conduct of individuals within a single market participant, that is, within a single business. . . . As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the Act."   *Id.* at 53, 691 S.E.2d at 680; *see also Weaver Inv. Co. v. Pressly Dev. Assocs.*, 234 N.C. App. 645, 654, 760 S.E.2d 755, 761 (2014) (dismissing plaintiff's UDTPA claim because "defendants' misconduct within the confines of the partnership was not 'in or affecting commerce'").

73.     The Court determines whether the alleged unfair or deceptive acts are "in or affecting commerce" as a matter of law.  *See Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71, 653 S.E.2d 393, 399 (2007); *Urquhart v. Trenkelbach*, 2017 NCBC LEXIS 12, *10 (N.C. Super. Ct. Feb. 8, 2017).

74. Defendants argue that Plaintiffs cannot maintain their claim for unfair and deceptive trade practices because the alleged conduct is related to internal business operations. (ECF No. 49, at p. 22.) Plaintiffs counter, and the Court agrees, that the Second Amended Complaint does not allege facts that solely relate to the internal operations of Breakthrough Cary, but rather to interactions between market participants Benz and his businesses and Dunn PT. At this stage, the allegations are sufficient to support a claim that the conduct was in or affecting commerce. Defendants' motion to dismiss Plaintiffs' claim for unfair and deceptive trade practices is DENIED.

THEREFORE, IT IS ORDERED that Defendants' Motion to Dismiss is GRANTED, in part, and DENIED, in part, as follows:

75. Defendants' Motion to Dismiss Plaintiffs' Sixth Claim for Relief is GRANTED.

76. Defendants' Motion to Dismiss Plaintiffs' First, Fourth, Fifth, Seventh, and Eighth Claims for Relief is DENIED.

77. Defendants' Motion to Dismiss Plaintiffs' Second Claim for Relief is DENIED to the extent it alleges breach of contract regarding the failure to make distributions under the Distribution Agreement. Defendants' Motion to Dismiss Plaintiffs' Second Claim for Relief is GRANTED to the extent it alleges breach of contract regarding the failure to make distributions under the Operating Agreement.

78. Defendants' Motion to Dismiss Plaintiffs' Third and Ninth Claims for Relief is DENIED to the extent those claims allege direct, non-derivative claims. In

addition, Plaintiffs' Third and Ninth Claims for Relief are DISMISSED WITHOUT PREJUDICE AS MOOT to the extent those claims allege derivative claims.

79.     Defendants' Motion to Dismiss Plaintiffs' Tenth Claim for Relief is DENIED to the extent it alleges fraud based on Benz's representations that the Acquisition Debt would be paid "below the line" and to the extent it alleges failure to pay distributions under the Distribution Agreement.  Defendants' Motion to Dismiss Plaintiffs' Tenth Claim for Relief is GRANTED to the extent it alleges fraud based on the allegations that Benz promised that he and Confluent would act in the best interests of Breakthrough Cary and promised to resolve the expense issues.

SO ORDERED, this the 24th day of August, 2018.


 /s/ Gregory P. McGuire 
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases